UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
(at Covington)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal Action No. 2: 10-62-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| BRUCE MARTIN, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

For several months in 2010, Defendant Bruce Martin was engaged in a conspiracy to distribute oxycodone pills in the Eastern District of Kentucky in violation of 21 U.S.C. §§ 841(a)(1) and 846. Using family members, Martin would obtain these pills from pain clinics in Florida, and then distribute the pills for a hefty profit. However, this conspiracy – like many others – ended when a confidential informant provided information regarding Martin's illegal activities to law enforcement. On August 30, 2010, Martin and his nephew and co-Defendant Reginald Moore were arrested during a controlled buy in Boone County, Kentucky. Both eventually confessed to their illegal distribution of Oxycodone pills. Shortly thereafter, Martin and Moore were named as defendants in a two-count indictment returned by a federal grand jury in this district. On December 27, 2010, Martin entered a guilty plea to one count. In exchange, the government agreed to seek dismissal of the second count.

On April 6, 2011, Martin was sentenced to a term of imprisonment of 168 months, to be followed by a six-year term of supervised release. [Record No. 44][1] Although Martin sought a lesser period of incarceration, the Court determined that incarceration for 168 months would be sufficient, but not greater than necessary punishment for his crime after considering all relevant statutory factors. That determination remains true today. As a result, Martin's current motion to have his sentence reduced under 18 U.S.C. § 3582 [Record No. 68] will be denied.

**I.**

Defendant Martin entered a guilty plea to Count 1 of the Indictment without the benefit of a written plea agreement. Therefore, the following factual summary is taken from the Offense Conduct section of his Presentence Investigation Report ("PSR").

> 6. The following information was obtained from reports from the Northern Kentucky Drug Strike Force (NKDSF). On August 27, 2010, agents with the NKDSF met with a cooperating witness (CW). This witness advised the agent of past transactions that had taken place between him and Bruce Martin. According to the CW, he began conducting drug transactions with Mr. Martin in approximately April 2010 when he was living in Florida. Every 2 to 4 days Mr. Martin would deliver approximately 850 pills to the CW's apartment. Those 850 pills consisted of 400 (30 mg) Oxycodone, 300 (15 mg) Oxycodone and 150 (2 mg) Xanax. Thes amounts varied based on Mr. Martin's ability to obtain the pills. The CW further advised the agents that the pills being purchased wee coming from prescriptions being filled by Martin's family members but believed that Martin had a network of other parties obtaining prescriptions.
>
> 7. Due to the above information, on August 27, 2010, NKDSF agents met with the cooperating witness to discuss a future drug transaction involving Oxycodone being delivered from Florida. The CW stated that he could have Bruce Martin deliver several hundred Oxycodone pills from Florida to the Northern Kentucky area.

---

[1] Defendant Moore was sentenced on April 29, 2011, to a term of incarceration of 48 months, followed by a six-year term of supervised release. [Record No. 59]

8. On this same date, the CW contacted Mr. Martin and he agreed to bring 500 (30 mg) pills and 200 (15 mg) pills to Northern Kentucky. According to the CW the 30 mg pills were $16 each and the 15 mg pills were $8 a piece each for a total price of $9,600. The transaction was set to occur on August 30, 2010.

9. On August 30, 2010, the CW made contact with Mr. Martin and he advised he was staying at a Florence, Kentucky hotel and had three people with him. He explained that they all had valid prescriptions for the Oxycodone he was going to sell. The CW and Mr. Martin agreed to meet in the front of the hotel and Mr. Martin would get into the CW's vehicle. Once in front of the hotel, Mr. Martin got into the CW's vehicle and made a call to the hotel room to an unknown person instructing them [sic] to leave the room. As this was occurring, agents spotted a black male driving Mr. Martin's vehicle from the rear of the hotel and park in front of the hotel. This individual was later identified as Reginald Moore, Mr. Martin's nephew, and that he occupied the room with Mr. Martin. Mr. Martin then entered the hotel room got the pills and returned to the CW's vehicle and began counting pills. Mr. Martin was then detained by agents. Reginald Moore was also detained as he was sitting in Mr. Martin's vehicle.

10. Agents recovered 500 (30 mg) Oxycodone tablets, 200 (15 mg) Oxycodone tablets, and the money that was to be used in the transaction, from the CW's vehicle. Mr. Martin confirmed that he traveled from Florida with his nephew, Reginald Moore, with Oxycodone pills to sell to the CW. He said that pills are from his prescriptions, his daughter's prescription, and Mr. Moore's prescription. Mr. Martin further stated that Mr. Moore was suppose to get $1,000 for the deal.

11. Further investigation revealed that Mr. Martin would pay for members of the conspiracy, including himself and Mr. Moore, to obtain prescriptions from clinics and to fill the prescriptions for Oxycodone. Mr. Martin would then take the prescriptions and sell them. Mr. Martin was responsible for distributing approximately 400 Oxycodone tablets of 39 milligrams each and approximately 300 Oxycodone tablets of 15 mg each on a weekly basis during the length of the conspiracy.

12. Reginald Moore was responsible for obtaining prescriptions of at least 140 Oxycodone tablets of 30 mg each and approximately 60 Oxycodone tablets of 15 mg each on a monthly basis during the length of the conspiracy.

[Record No. 51]

Defendant Martin objected to drug quantity and the leadership role assigned by the probation officer in his PSR. [Record No. 62] After considering the evidence presented regarding these issues, the Court determined that a Base Offense Level of 30 under the United States Sentencing Guidelines should be applied in calculating an appropriate guideline range applicable to Martin's conduct. Additionally, the Court found that a four-level enhancement for Martin's leadership role was appropriate. [*Id.*, pp. 40-47] As a result, the Court calculated Martin's non-binding range for incarceration to be 135 to 168 months. [*Id.*, p. 48] Martin challenged these findings on appeal but was unsuccessful. [Record No. 66]

In arguing for a sentence of 135 months, Martin's counsel acknowledged the seriousness of the offense, but contended that the offense was not a crime of violence and that the defendant did not possess a weapon in carrying out the crime. Additionally, Martin and his attorney cited the defendant's age (57), medical ailments (asthma, HIV and a bulging disc), lack of education, family responsibilities, and acceptance of responsibility. [*Id.*, p. 49-52] Conversely, during argument and in the Sentencing Memorandum submitted prior to the sentencing hearing, counsel for the United States requested a more lengthy sentence. [Record Nos. 40; 62, p. 53-55]

The United States' arguments focused on Martin's lengthy history of criminal conduct (four prior felony convictions, three of which involved drug trafficking, and four arrests for assault), the seriousness of the offense of conviction, the number of participants involved, Martin's leadership role, the fact that Martin willingly involved family members in his criminal

conduct, and the need to provide deterrence and to protect the public from future crimes. As the government noted in its Sentencing Memorandum:

> The nature and characteristics of the offense are very serious. The Defendant distributed significant amounts of prescription drugs through a substantial conspiracy for an extended period of time. He was the leader of this organization. He used family members to commit these offenses and was involved in Florida pain clinics that have been the source of substantial problems related to prescription drug abuse. . . .
>
> The Defendant's personal characteristics also indicate a need for a sentence at the top of the guidelines. He has three prior drug convictions, two of them for trafficking offenses. He would be a career offender if not for th age of his first trafficking case. He has been convicted of battery and falsely reporting a crime.
>
> . . . . He has returned to the commission of felony offenses shortly after serving substantial prison sentences on two prior occasions. His prior periods of incarceration have led to new offenses for similar conduct. The only conclusion to be drawn from his past actions is that the Defendant has no respect for the law and that he will commit more dangerous offenses upon his release from prison. . . .

[Record No. 40]

After considering all relevant information presented by the parties, the Court determined that a sentence of 168 months was needed to meet all statutory goals of sentencing. In reaching this determination, the Court first noted that the guideline range was not binding with respect to the sentence ultimately imposed. [Record No. 62, p. 55] Next, the Court cited: the seriousness of the offense involving large quantities of prescription pills originating from Florida pain clinics; the consequences of the offense on the public as well as family members; the need to promote respect for the law by individuals such as Martin, Martin's negative characteristics which included the nature, length and seriousness of his criminal history, and the important goal of providing both individual and general deterrence. In relevant part, the Court noted that,

> to provide sufficient deterrence in this case . . . a sentence at the top of the guidelines would be warranted, if not perhaps above the guideline range. Such a sentence would also provide sufficient protection for the public, because in the Court's opinion, unless Mr. Martin has a dramatic change while he's incarcerated, he'll continue to engage in criminal conduct once he is released . . . [thus,] a sentence [of 168 months] at the top of the guideline range would be necessary.

[*Id.*, pp. 57-58]

In concluding that a term of incarceration of at least 168 months was needed to meet all statutory goals of sentencing, the Court specifically rejected the defendant's argument for a sentence of 135 months. [*Id.*, p. 57] While this sentence was at the top of the defendant's guideline range, the undersigned clearly recognized then – and recognizes now – that the guidelines were not binding on this determination. A sentence of 135 months or less does not meet these goals suddenly because the United States Sentencing Commission lowers the guideline range for most drug offenses. Here, the minimum sentence which meets these goals remains 168 months of incarceration. Anything less would unduly diminish the seriousness of the offense, would not provide sufficient general or specific deterrence, and would not provide proper punishment to Defendant Martin.

**II.**

As the Court stated at the conclusion of the sentencing hearing:

> The Court believes that a sentence of 168 months would be sufficient under the facts that are presented, but not greater than necessary, to meet the statutory purposes of Title 18, Section 3553(a)(2). And, therefore, the Court finds that a sentence of 168 months would be necessary in this particular case.

[*Id.*, p. 59] Those findings were neither hollow, insincere, nor insignificant at the time they were made, and they are no less important now. Accordingly, it is hereby

**ORDERED** that Defendant Bruce Martin's Motion to Reduce Sentence Pursuant to 18 U.S.C. § 3582(c) [Record No. 68] is **DENIED**.

This 3rd day of November, 2014.

Signed By:
*Danny C. Reeves* DCR
United States District Judge